David A. Bahr (D.D.C. Bar # OR0001)
1035 ½ Monroe St
Eugene, OR 97402
(541) 566-6439
davebahr@mindspring.com

Kristine Akland (Montana Bar # 13787) (*pro hac vice* application pending)
317 E Spruce St, P.O. Box 7274
Missoula, MT 59807
(406) 544-9863
aklandlawfirm@gmail.com

John Persell (Utah Bar # 17298) (*pro hac vice* application pending)
309 N Holland St
Portland, OR 97217
(503) 896-6472
jpersell@westernwatersheds.org

*Attorneys for Plaintiffs*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT<br>126 S Main Street, Suite B<br>P.O. Box 1770<br>Hailey, ID 83333,<br><br>ALLIANCE FOR THE WILD ROCKIES<br>P.O. Box 505<br>Helena, MT 59624,<br><br>and YELLOWSTONE TO UINTAS<br>CONNECTION<br>P.O. Box 280<br>Mendon, UT 84325,<br><br> Plaintiffs,<br><br>v. | Civil Case No. 1:20-cv-860 |

COMPLAINT - 1

DAVID BERNHARDT,
in his official capacity as
Secretary, U.S. Department of the Interior,
1849 C Street NW
Washington, DC 20240,

UNITED STATES FISH AND WILDLIFE
SERVICE,
1849 C Street NW
Washington, DC 20240,

and UNITED STATES FOREST SERVICE,
1400 Independence Avenue SW
Washington, DC 20250,

Defendants.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.      The Greater Yellowstone Ecosystem (GYE) is one of the only places in the Lower 48 United States that still supports a full complement of native wildlife, including moose, elk, pronghorn, wolves, and grizzly bears. The region's forests, meadows, high plains, and mountainous terrain comprise one of Earth's largest temperate-zone ecosystems still existing in a mostly-intact state.

2.      The Upper Green River area, on the southern end of the GYE, is often compared to Yellowstone National Park's world-renowned Lamar Valley in terms of biodiversity richness. The Upper Green River area lies at an important crossroads and connection point for many species, including grizzly bears, as they forage for food, migrate, and disperse into surrounding areas. The area also contains at least 27 stream miles of native Colorado River cutthroat trout habitat, leks for greater sage-grouse, and habitat for the Kendall Warm Springs dace, a small endemic fish.

3.      These ancestral lands of the Kohogue (Green River Shoshone) people are vital to the recovery and survival of the grizzly bear and the Kendall Warm Springs dace, both species protected under the Endangered Species Act (ESA). The GYE provides one of just five remaining isolated populations of grizzly bears in the Lower 48, while the Kendall Warm Springs are the only known habitat for the imperiled dace.

4.      Unfortunately, recent actions by federal agencies increase threats to these species and to the integrity of the GYE. On October 11, 2019, the United States Forest Service (USFS) authorized domestic livestock grazing permits across 170,643 acres of suitable grizzly bear habitat within the GYE, and authorized cattle-herding through the Kendall Warm Springs exclosure. Through the Upper Green River Area Rangeland Project (UGRA Project) on the Bridger-Teton National Forest, USFS permits 8,772 cow/calf pairs and 47 horses to graze six allotments in the area between June 14 and October 15 for the next ten years. UGRA Project Record of Decision at 5.

5.      Because USFS recognized domestic livestock grazing on these lands would adversely affect grizzly bears, the agency consulted with the United States Fish and Wildlife Service (FWS) regarding the UGRA Project's impacts. On April 29, 2019, FWS produced a Biological Opinion for the Effects to the Grizzly Bear (*Ursus arctos horribilis*) from the Upper Green River Area Rangeland Project (2019 Biological Opinion), with the Reference Number 06E13000-2019-F-0012.

6.      In its 2019 Biological Opinion, FWS concluded the UGRA Project would not jeopardize the continued existence of the grizzly bear in the GYE. Further, FWS included an Incidental Take Statement with the Biological Opinion exempting from civil and criminal

liability under the ESA the killing of up to 72 grizzly bears over the next ten years in association

with the UGRA Project. 2019 Biological Opinion at 46 and 48.

7.      USFS denied that the UGRA Project would adversely affect the Kendall Warm

Springs dace. FWS concurred and no formal consultation for that species occurred.

8.      This lawsuit challenges FWS's unlawful 2019 Biological Opinion and Incidental

Take Statement regarding the UGRA Project's effects on grizzly bears for violation of section 7

of the ESA. Specifically, FWS violated section 7 of the ESA, 16 U.S.C. § 1536, by failing to

consider the best scientific and commercial data available regarding grizzly bear population

dynamics and recovery in the GYE, ignoring important aspects of the problem, arbitrarily relying

on ineffective conservation measures that lack certainty and specificity, and failing to rationally

justify its exemption from ESA liability the anticipated killing of 72 grizzly bears.

9.      USFS violated section 7 of the ESA by unlawfully relying on the FWS's flawed

2019 Biological Opinion and Incidental Take Statement to satisfy its own duty to ensure its

actions do not threaten the continued existence of grizzly bears in the GYE.

10.     USFS also violated section 9 of the ESA, 16 U.S.C. § 1538, which prohibits

"take" of ESA-protected species. "Take" is defined by the ESA to include "harm." 16 U.S.C.

§ 1532(19). USFS admits in its Final Environmental Impact Statement for the UGRA Project

(UGRA FEIS) that the herding of cattle through the Kendall Warm Springs exclosure could

"cause dace to temporarily switch habitat, elevate turbidity, and alter submergent vegetative

cover," all of which constitute harm and an illegal take of the dace. UGRA FEIS at 289.

11.     USFS and FWS both violated section 7 of the ESA, 16 U.S.C. § 1538, by failing

to engage in formal consultation regarding the effects of the UGRA Project on the Kendall

Warm Springs dace.

12.     Plaintiffs Western Watersheds Project, Alliance for the Wild Rockies, and

Yellowstone to Uintas Connection ask this Court to vacate and remand the challenged agency

actions in the interest of protecting the recovery trajectory of the GYE's grizzly bears and the

survival of the Kendall Warm Springs dace as required by law and as intended by Congress.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331

(federal question) and 16 U.S.C. § 1540(c), (g) (ESA), and may issue a declaratory judgment and

relief pursuant to 28 U.S.C. § 2201-02 and 16 U.S.C. § 1540 (ESA). Plaintiffs bring this action

pursuant to the Administrative Procedure Act, 5 U.S.C. § 706, and the ESA citizen suit

provision, 16 U.S.C. § 1540(g), both of which waive Defendants' sovereign immunity.

14.     Plaintiffs provided Defendants with notice of Plaintiffs' intent to sue on January

24, 2020, as required by 16 U.S.C. § 1540(g)(2).

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(e) because federal

Defendants reside in this District.

## PARTIES

16.     Plaintiff WESTERN WATERSHEDS PROJECT is a non-profit conservation

organization founded in 1993 with the mission of protecting and restoring western watersheds

and wildlife through education, public policy initiatives, and legal advocacy. Headquartered in

Hailey, Idaho, Western Watersheds Projects has over 12,000 members and supporters.

17.     Plaintiff ALLIANCE FOR THE WILD ROCKIES is a non-profit organization

dedicated to the protection and preservation of native biodiversity of the Northern Rockies

Bioregion, its native plant, fish, and animal life, and its naturally functioning ecosystems. Its

registered office is in Montana. Alliance for the Wild Rockies has over 2,000 individual members.

18.     Plaintiff YELLOWSTONE TO UINTAS CONNECTION is a non-profit entity working to restore fish and wildlife habitat, including the regionally significant wildlife corridor connecting the GYE to the Uintas Mountains and Southern Rockies, through the application of science, education, and advocacy. Its registered office is in Utah.

19.     Plaintiffs' members and staff use public lands in the GYE, including lands with the Upper Green River Area Rangeland Project area, for professional and recreational pursuits, including hiking, fishing, camping, backpacking, hunting, horseback riding, wildlife viewing (including bear watching), and aesthetic enjoyment. Plaintiffs' members and staff also use these same lands for scientific study. Plaintiffs' members and/or staff have viewed and have planned concrete efforts to view grizzly bears and signs of bear presence in the wild in the GYE, including the Upper Green River Area Rangeland Project area. For this reason, FWS's and USFS's challenged actions represent a direct threat to interests of all Plaintiffs. Accordingly, the legal violations alleged in this complaint cause direct injury to the aesthetic, conservation, recreational, scientific, educational, professional, and wildlife preservation interests of the Plaintiffs and/or Plaintiffs' members.

20.     Plaintiffs' aesthetic, conservation, recreational, scientific, educational, professional, and wildlife preservation interests have been, are being, and unless their requested relief is granted, will continue to be adversely and irreparably injured by Defendants' failure to comply with federal law. These are actual and concrete injuries, traceable to Defendants' conduct that would be redressed by the requested relief. Plaintiffs have no adequate remedy at law.

21.     Defendant DAVID BERNHARDT is the United States Secretary of the Interior. In that capacity, Secretary Bernhardt has supervisory responsibility over the United States Fish and Wildlife Service. Secretary Bernhardt is sued in his official capacity.

22.     Defendant UNITED STATES FISH AND WILDLIFE SERVICE is an agency of the United States within the Department of the Interior charged with administering and enforcing the Endangered Species Act. FWS is responsible for preparing the challenged 2019 Biological Opinion and Incidental Take Statement regarding the Upper Green River Area Rangeland Project as part of its obligations under the Endangered Species Act.

23.     Defendant UNITED STATES FOREST SERVICE is an agency of the United States within the Department of Agriculture charged with managing the Bridger-Teton National Forest and other units of the National Forest System according to federal statutes and regulations. USFS oversees livestock grazing on the Bridger-Teton National Forest as well as the management of other Forest uses and resources. USFS authorized the challenged Upper Green River Area Rangeland Project.

## THE ENDANGERED SPECIES ACT

24.     The Endangered Species Act, 16 U.S.C. § 1531 *et seq.*, is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). Congress enacted the ESA to "provide a program for the conservation of . . . endangered species and threatened species" and "to provide a means whereby ecosystems upon which endangered species and threatened species depend may be conserved." 16 U.S.C. § 1531(b).

25.     In order to receive the full protections of the ESA, the Secretary of the Interior must list a species as "endangered" or "threatened" pursuant to section 4 of the Act. *See id.* §

1533. The ESA defines "endangered species" as "any species which is in danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6). Under the ESA, a "threatened species" is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20).

26.     Section 7 of the ESA commands that all federal agencies "shall, in consultation with and with the assistance of" the relevant Secretary or representative wildlife agency (FWS for terrestrial species such as the grizzly bear) "utilize their authorities in furtherance of the purposes of [the ESA] by carrying out programs for the conservation of endangered species and threatened species," *id.* § 1536(a)(1), and "insure that any action authorized, funded, or carried out by [any agency] is not likely to jeopardize the continued existence of any endangered species or threatened species," *id.* § 1536(a)(2). Regulations implementing the consultation requirement direct that formal consultation is required before a federal agency may take "any action [that] may affect listed species." 50 C.F.R. § 402.14(a) (2015).

27.     Section 7(a)(2) of the ESA requires every federal agency to "use the best scientific and commercial data available" in assessing the effects of a proposed action on protected species during this consultation process. 16 U.S.C. § 1536(a)(2); *see also* 50 C.F.R. § 402.14(d).

28.     Through formal consultation, FWS must "[r]eview all relevant information" and evaluate both the current status of, as well as the effects of the proposed action on, the listed species. 50 C.F.R. § 402.14(g)(1), (2), and (3). Formal consultation results in the issuance of a biological opinion by the wildlife agency, in this case FWS. *See* 16 U.S.C. §§ 1536(a)(2) and (b)(3)(A). Under ESA regulations, a "biological opinion shall include . . . [a] summary of the information on which the information is based," a "detailed discussion of the effects of the action

on listed species," and the "Service's opinion on whether the action is likely to jeopardize the continued existence of a listed species . . . ." 50 C.F.R. § 402.14(h)(1), (2), and (3).

29.     Under the operative regulations in place at the time FWS produced the 2019 Biological Opinion, "effects of the action" to be evaluated include "direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action, that will be added to the environmental baseline." 50 C.F.R. § 402.02. Effects need not be certain or adverse in order to be included in a biological opinion; instead, "petitioners need to show only that an effect on listed species or critical habitat is plausible." *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 698 F.3d 1101, 1122 (9th Cir. 2012).

30.     The environmental baseline for a project "includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area that have already undergone formal or early section 7 consultation, and the impacts of State or private actions which are contemporaneous with the consultation in process." 50 C.F.R. § 402.02.

31.     By regulatory definition, the "action area" for section 7 consultation purposes must include "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." 50 C.F.R. § 402.02.

32.     In addition, the Secretary must specify in a biological opinion the impact of any authorized incidental take on the listed species. *Defenders of Wildlife v. Babbitt*, 130 F. Supp. 2d 121, 127 (D.D.C. 2001). "The impact of an authorized incidental take cannot be determined or analyzed in a vacuum, but must necessarily be addressed in the context of other incidental take authorized by FWS." *Id.*

33.     If the consulted wildlife agency relies upon mitigation or conservation measures to reach a conclusion of "no jeopardy," such "measures must be reasonably specific, certain to occur, and capable of implementation." *Ctr. for Biological Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139, 1152 (D. Ariz. 2002) (citing *Sierra Club v. Marsh*, 816 F.2d 1376 (9th Cir. 1987) (abrogated on other grounds)).

34.     Even if FWS concludes in the biological opinion that the agency's proposed action is not likely to jeopardize a listed species, FWS still must specify the amount or extent of any incidental "take" of the species that is anticipated to occur as a result of the action. 16 U.S.C. § 1536(b)(4); 50 C.F.R. §§ 402.14(i)(1)(i).

35.     "Take," under the ESA, "means to harass, harm, pursue, hunt, shoot wound, kill, trap, capture, or collect, or any attempt to engage in any such conduct." 16 U.S.C. § 1532(19). "Harm" is defined as "an act which actually kills or injures wildlife." 50 C.F.R. § 17.3. This includes habitat degradation that "actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering." *Id.* Any unauthorized "take" of an endangered or threatened species is illegal under the ESA and subject to civil and criminal liability. 16 U.S.C. § 1538(a)(1)(B).

36.     FWS must specify quantities of exempted incidental take of endangered or threatened wildlife in an "incidental take statement" (ITS). 50 C.F.R. § 402.14(i). An ITS authorizes the action agency, if in compliance with the statement's "reasonable and prudent measures" and "terms and conditions," to "take" listed species without facing otherwise applicable ESA civil or criminal liability. 16 U.S.C. § 1536(o)(2); 50 C.F.R. § 402.14(i)(1)(ii) and (iv); *id.* § 402.14(i)(5).

37.     A biological opinion produced through section 7 formal consultation is a final agency action subject to judicial review under the arbitrary and capricious standard. *See Mayo v. Jarvis*, 177 F. Supp. 3d 91, 105 (D.D.C. 2016) (citation omitted). Under this standard, agency action must be set aside if it is "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). An "agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Veh. Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983) (citation omitted).

38.     An agency's decision is arbitrary and capricious if the agency (1) entirely failed to consider an important aspect of the problem, (2) offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise, (3) failed to base its decision on consideration of the relevant factors, or (4) made a clear error of judgment. *See id.*

39.     The D.C. Circuit has held that a biological opinion "must be upheld as long as the [Fish and Wildlife Service] 'considered the relevant factors and articulated a rational connection between the facts found and the choice made.'" *Am. Rivers v. Fed. Energy Regulatory Comm'n*, 895 F.3d 32, 35 (D.C.C. 2018) (citations omitted).

40.     Even after FWS's procedural requirements of a consultation are complete, however, the ultimate duty to ensure that an activity does not jeopardize a listed species lies with the action agency, in this case USFS. An action agency's reliance on an inadequate, incomplete, or flawed biological opinion to satisfy its ESA section 7 duties is unlawful under the ESA. *See* 16 U.S.C. § 1536(a)(2).

## FACTUAL BACKGROUND

### A.   Grizzly Bears and the Greater Yellowstone Ecosystem

41.    There were once more than 50,000 grizzly bears across the western portion of what is now the Lower 48 United States. Following the arrival of Europeans to North America, the species' population plummeted to less than 1,000 individuals in the Lower 48 due to hunting for sport, government-sponsored predator eradication efforts to support the livestock industry, and wide-scale habitat loss and conversion. *See generally* Revised Grizzly Bear Recovery Plan, p. ii (USFWS 1993), available at https://www.fws.gov/mountain-prairie/es/species/mammals/grizzly/Grizzly_bear_recovery_plan.pdf (last visited March 31, 2020).

42.    In 1975, FWS listed the grizzly bear in the "48 conterminous States" as "threatened" under the ESA due to its dangerously low numbers and on-going threats to the species' survival. 40 Fed. Reg. 31736 (July 28, 1975).

43.    Since the grizzly bear received federal protection, its numbers have increased to about 2,000 individuals in the Lower 48, spread among five isolated population areas that constitute less than two percent of its former range south of the Canadian border. One of those areas is the GYE. *See* 2019 Biological Opinion at 13-14.

44.    The GYE spans a relatively intact region of temperate forests, meadows, high plains, and mountains spread across northwest Wyoming and overlapping into the neighboring states of Idaho and Montana. According to the National Park Service, five national forests, three national wildlife refuges, and other public, private, and tribal lands with Yellowstone and Grand Teton national parks at their core comprise this world-renowned ecosystem. *See* Greater Yellowstone Ecosystem, National Park Service (last updated Dec. 12, 2019), available at

https://www.nps.gov/yell/learn/nature/greater-yellowstone-ecosystem.htm (last visited March 31,

2020).

45.     Because of the complex land management structure in the GYE and the wide

array of federal, state, and tribal authorities interested in the recovery of the region's grizzly bear

population, the Department of the Interior formed the Interagency Grizzly Bear Study Team

(IGBST) in 1973 for purposes of long-term monitoring and research. *See* Interagency Grizzly

Bear Study Team webpage, available at https://www.usgs.gov/science/interagency-grizzly-bear-

study-team?qt-science_center_objects=0#qt-science_center_objects (last visited March 31, 2020)

46.     The IGBST now consists of FWS, USFS, the U.S. Geological Survey, the

National Park Service, the Eastern Shoshone and Northern Arapaho Tribal Fish and Game

Department, and the state wildlife agencies of Wyoming, Idaho, and Montana. *Id.*

47.     Grizzly bears in the GYE have large home ranges: 81 square miles for females

and 309 square miles for males. 2019 Biological Opinion at 12 (citing Bjornlie *et al.* 2014).

According to FWS, "[l]oss and fragmentation of habitat is particularly relevant to the survival of

grizzly bears." *Id.* Recently, the Montana District Court recognized the importance of habitat

connectivity: "The Service does not have unbridled discretion to draw boundaries around every

potentially healthy population of a listed species without considering how that boundary will

affect the members of the species either side of it." *Crow Indian Tribe v. United States*, 343 F.

Supp. 3d 999, 1013 (D. Mont. 2018).

48.     Grizzly bears reproduce very slowly; most females do not give birth until the age

of five years, and litter sizes are small. 2019 Biological Opinion at 12. Because cubs stay with

the mother for up to two years, there are lengthy periods between litters. *Id.*

49.     According to FWS, "providing maximum protection for females is essential to recovery" of grizzly bears, because females and dependent cubs are key to the species' survival. Revised Grizzly Bear Recovery Plan, Part One, p. 5 (USFWS 1993).

50.     FWS states that "[t]he two primary challenges in grizzly bear conservation are the reduction of human caused mortality and the conservation of remaining habitat." 2019 Biological Opinion at 13 (citing USFWS 1993). Grizzly bear persistence is "negatively associated with human and livestock densities." *Id.* at 27 (citing Mattson and Merrill 2002).

51.     Between 1997 and 2017, over 70 percent of all grizzly bear mortalities in the GYE stemmed from anthropogenic causes, as opposed to natural causes. 2019 Biological Opinion at 20. Of these, at least 86 resulted from conflicts with livestock. *Id.*

52.     In the GYE, FWS and partner agencies manage grizzly bears and their habitat by combining the "Primary Conservation Area" with "adjacent areas where occupancy by grizzly bears is anticipated and acceptable." 2016 Final Conservation Strategy, p. 1 (IGBST 2016), available at http://igbconline.org/wp-content/uploads/2016/03/161216_Final-Conservation-Strategy_signed.pdf (last visited March 31, 2020). Combined, this forms the "Demographic Monitoring Area" (DMA) within which recovery criteria for grizzly bears are assessed. *Id.*, p. 4.

53.     As of 2017, the Greater Yellowstone Ecosystem supports an estimated 718 individual grizzly bears. Yellowstone Grizzly Bear Investigations 2017, Annual Report of the Interagency Grizzly Bear Study Team, p. 2 (IGBST 2017), available at https://prd-wret.s3-us-west-2.amazonaws.com/assets/palladium/production/atoms/files/2017_AnnualReport_Final%28508%29.pdf (last visited March 31, 2020).

54.     Based on this estimated population size, FWS follows mortality thresholds for three cohorts of grizzly bears: independent females, dependent young, and independent males. The mortality thresholds for these three cohorts across the DMA are 9 percent, 9 percent, and 20 percent respectively. Grizzly Bear Recovery Plan Supplement: Revised Demographic Recovery Criteria for the Yellowstone Ecosystem, p. 6 (USFWS 2017), available at

https://ecos.fws.gov/docs/recovery_plan/GYE_RP_Supplement_2017_final.pdf (last visited March 31, 2020).

55.     Under FWS's revised Demographic Recovery Criterion 3 for the GYE grizzly bear population, "[i]f mortality limits are exceeded for any sex/age class for three consecutive years and any annual population estimate falls below 612 . . . the IGBST will produce a Biology and Monitoring Review to inform the appropriate management response." *Id.*, p. 5.

56.     Despite its relatively pristine qualities, the GYE is experiencing significant effects of global climate change, which is altering the distribution and availability of food sources for native wildlife, including grizzly bears.

57.     Whitebark pine seeds are an important autumn food source for grizzly bears. 2019 Biological Opinion at 11. However, roughly 70% of mature cone-producing whitebark pine trees were lost in the GYE between 2000 and 2010 to a climate-driven outbreak of mountain pine beetles.

58.     In the 2019 Biological Opinion, FWS states that "[i]n years of poor whitebark pine seed production, grizzly bears shifted their diets and consumed more meat." 2019 Biological Opinion at 11. FWS goes on to state "[w]e have information suggesting that whitebark pine has been reduced in the GYE, since 2002 and, therefore, may not be a major food source as previously concluded [sic]." *Id.*

**B.      Grizzly Bears Conflicts in the UGRA Project Area**

59.      USFS authorized the UGRA Project on October 11, 2019. *See* UGRA Project

Record of Decision. The UGRA Project area includes 170,643 acres on six grazing allotments:

Badger Creek, Beaver-Twin Creeks, Noble Pastures, Roaring Fork, Upper Green River, and

Wagon Creek. These allotments lie across the headwaters of the Green River and Gros Ventre

River, and include portions of the Gros Ventre and Bridger Wilderness areas. UGRA FEIS at 2.

60.      All of the allotments are within occupied grizzly bear habitat and within the

Demographic Monitoring Area for GYE grizzly bears designated by the IGBST. 2019 Biological

Opinion at 27.

61.      Despite the UGRA Project allotments comprising just a sliver of the entire GYE,

grizzly bear mortality in the allotments constituted nearly 13% of all mortality across the GYE in

2018. 2019 Biological Opinion at 31.

62.      The IGBST Annual Reports provide data regarding numbers of conflicts on

various grazing allotments by year, going back to 1995. *See* IGBST Annual Reports, available at

https://www.usgs.gov/centers/norock/science/igbst-annual-reports?qt-

science_center_objects=1#qt-science_center_objects (last visited March 31, 2020).

63.      When compiled and graphed, the IGBST Annual Report data show the sharp

uptick in conflicts coincident with terminal decline in whitebark pines:



*Figure 1, generated by Plaintiffs using IGBST Annual Report data.*

64.     In Figure 1, the map in panel A shows all allotments in the GYE, including allotments that have been retired (dark green), allotments without conflicts (light green), allotments with a few conflicts (beige), and allotments with chronic high levels of conflict (red). The map shows that the Upper Green River area (Upper Green Complex) sits astride connectivity between potential and recently occupied habitat in the Wind River Range farther south and east and the remainder of grizzly bear distribution elsewhere.

65.     The number of conflicts in the Upper Green River area is disproportionately higher than any other single allotment or complex of grazing allotments in the GYE.

66.     The data also show that when an allotment is retired, conflicts are eliminated. This was done with the Blackrock-Spread Creek allotments immediately to the northwest of the Upper Green River area where high levels of chronic conflict were driven by the same

configuration of landscape conditions and uses as the Upper Green River. *See* 2019 Biological

Opinion at 42.

67.     In Figure 1, the map in panel B shows livestock-related conflicts in the GYE (red

dots) relative to patterns of loss of whitebark pine. The data shows that conflicts on the Upper

Green Complex sit squarely in the middle of an extensive area where there were heavy losses of

whitebark pine.

68.     In Figure 1, IGBST data in panel D shows the dramatic jump in conflicts

specifically on the Upper Green River area allotments juxtaposed with the trend in loss of

whitebark pines.

69.     The Upper Green River Complex allotments have been consistently characterized

as having "chronic conflicts." *See* 2018 IGBST Annual Report, Appendix A, pp. 104-08,

available at https://prd-wret.s3.us-west-

2.amazonaws.com/assets/palladium/production/atoms/files/2018_AnnualReport_FINAL%28508

%29.pdf (last visited March 31, 2020).

70.     Ebinger *et al.* (2015), Mattson (1997), and Schwartz *et al.* (2013)[1] show that

either consumption of meat varies inversely with availability of pine seeds (Mattson) or has

increased since the decline of whitebark pines, presumably as a compensatory shift in diet

(Ebinger and Schwartz).

---

[1] Michael R. Ebinger *et al.*, *Detecting grizzly bear use of ungulate carcasses using global positioning system telemetry and activity data*, DOI 10.1007/s00442-016-3594-5 Oecologia (2015); David Mattson, *Wilderness-Dependent Wildlife*, 3(4) International Journal of Wilderness 34 (1997); Charles C. Schwartz *et al.*, *Body and Diet Composition of Sympatric Black and Grizzly Bears in the Greater Yellowstone Ecosystem,* DOI 10.1002/jwmg.633, The Journal of Wildlife Management (2013).

71.     Additionally, MacFarlane *et al*. (2013)[2] shows patterns of whitebark pine mortality as of 2009 in the GYE, including the Upper Green River area. The map in this study is the most comprehensive map of whitebark pine losses.

72.     In addition to whitebark pine seeds, army cutworm moths can also be an important fall source of food to grizzly bears. 2019 Biological Opinion at 11. "Army cutworm moths congregate in remote, high altitude alpine talus areas and feed on alpine flowers." *Id.*

73.     The Upper Green River area does not contain sites where army cutworm moths are available, and therefore cannot replace whitebark pine seeds as part of the grizzly bear's diet here. UGRA FEIS at 326.

74.     The Robison (2009)[3] study provides information regarding known distribution of moth sites in the GYE relative to alpine habitats and areas of deep snow pack. When mapped, the data shows that there are no moth sites known to be used by grizzly bears near the Upper Green River area allotments:

---

[2] William W. MacFarlane *et al.*, *An innovative aerial assessment of Greater Yellowstone Ecosystems mountain pine beetle-caused whitebark pine mortality*, 23(2) Ecological Applications 421 (2013).

[3] Hillary L. Robison, *Relationships between Army Cutworm Moths and Grizzly Bear Conservation*, University of Nevada (2009); Mattson *et al.*, *Bear feeding activity at alpine insect aggregation sites in the Yellowstone ecosystem,* 69 Canadian Journal of Zoology 2430-2435 (1991b); French *et al.*, *Grizzly bear use of army cutworm moths in the Yellowstone ecosystem,* 9 Conference on Bear Research and Management 389-399 (1994).



*Figure 2, generated by Plaintiffs using data from the 2018 IGBST Annual Report and the studies cited in Footnote 3, above.*

75.     In Figure 2, in the map in panel B, IGBST data show the known distribution of moth sites in the GYE (yellow dots) relative to alpine habitats (green) and areas of deep snowpack (purple).

76.     In Figure 2, panels C and D, IGBST data regarding moth sites and bear sightings at those moth sites are graphed and mapped. The data show trends in numbers of moth sites used

by bears indicated by the burgundy line. The red line shows the number of bear sightings on these sites. Panel C shows that levels of bear activity on a fixed number of moth sites jumped dramatically in 2010. The year 2010 was the tail end of the mass loss of whitebark pines.

77.     The concentrations of bears using moth sites are shown in Panel D. In areas with numerous nearby army cutworm moth sites but with levels of whitebark pine loss comparable to the Upper Green River area, depredation has not increased as much as in the Upper Green River area.

78.     Although numbers of moth sites have not increased, levels of bear activity on these sites have increased substantially since 2010, likely in compensation for losses of whitebark pines (data from 2018 IGBST Report).

79.     According to IGBST data, in the Absaroka Range, losses of whitebark pines were even heavier, yet livestock-related conflicts did not increase in nearby areas. The data show that in the Absarokas, the concentration of sites where army cutworm moths are available to bears in the alpine (green dots) is high.

80.     According to IGBST data, bear use of moth sites in the Absarokas increased dramatically along with the loss of whitebark pines. This suggests that bears in the Absarokas had compensated by eating more moths when the loss of whitebark pines occurred.

81.     In Figure 1, IGBST data in the figures to the right, in panel C, show the dramatic increases in bear mortalities in the Wyoming portion of the GYE driven largely by increases in bears dying from livestock-related conflicts (red).

82.     In the 2019 Biological Opinion, FWS states that "[w]hen certain food resources are in declines, daily movement, fall movement, and home ranges did not change between 2000 and 2011 suggesting that grizzly bears find alternative foods within their home range as

whitebark pine seeds became less available (82 FR 30538, June 30, 2017)." 2019 Biological Opinion at 11.

83.     FWS also recognizes "[t]he frequency of human-grizzly bear conflicts is inversely associated with the abundance of natural bear foods. (Gunther *et al.* 2004)." 2019 Biological Opinion at 23.

84.     FWS acknowledges there is a trend of increasing livestock conflicts with grizzlies in the Upper Green River allotments since 2010. 2019 Biological Opinion at 29. Grizzly bear conflicts in the Upper Green River area allotments have increased at an average rate of 9% in recent years, far outpacing any population growth of the GYE grizzly bear population. *Id.* at 29.

85.     Further, FWS concedes that the number of grizzly bear conflicts and mortalities in the Upper Green River area is disproportionately higher than any other single allotment or complex of grazing allotments in the GYE grazing. 2019 Biological Opinion at 30-31.

86.     Under current grazing management authorized by USFS, allotment permittees are allowed to drag dead livestock into the Upper Green River area backcountry away from roads, increasing the likelihood grizzly bears will encounter and rely on these carcasses for food. *See* 2019 Biological Opinion at 7. The decrease in whitebark pines as a food source, the lack of army cutworm moths, and the attractiveness of high-quality anthropogenic food in the form of livestock make the Upper Green River area allotments an "ecological trap" for grizzly bears (an attractive area characterized by high mortality), as has been described for grizzly and brown bears elsewhere (Knight *et al.* 1988; Lamb *et al.* 2017).[4]

---

[4] Richard R. Knight *et al.*, *Mortality Patterns and Population Sinks for Yellowstone Grizzly Bears*, 16(2) Wildlife Society Bulletin 121-125 (1988); Clayton T. Lamb *et al.*, *Effects of Habitat Quality and Access Management on the Density of a Recovering Grizzly Bear Population*, 55 Journal of Applied Ecology 1406-1417 (2017).

87.     The Wyoming Range, south of the Upper Green River area, and the Wind River Range, southeast of the Upper Green River area, contain ample potential suitable habitat for grizzly bears.

88.     The Upper Green River area sits squarely astride connective habitat between the core of grizzly bear distribution in the GYE and this potential habitat. This creates a "fracture zone" between suitable habitat areas for grizzly bears, and USFS recognizes the UGRA Project area as a "mortality sink" for female grizzly bears due to past and expected lethal removal of female grizzly bears. UGRA FEIS at 325.

89.     Despite the decrease in whitebark pines as a food source, the lack of army cutworm moths in the Upper Green River area, and USFS's recognition that the UGRA Project area is a "mortality sink" for female grizzly bears, FWS does not evaluate the effects of these relevant factors in association with the UGRA Project on grizzly bears in the 2019 Biological Opinion.

90.     The 2019 Biological Opinion fails to analyze the loss of whitebark pines coupled with the presence of livestock which serves as an attractive high-quality food source for grizzly bears in the area.

91.     Additionally, the 2019 Biological Opinion also does not analyze the effects that high levels of road access and livestock-related grizzly bear mortality within the Upper Green River area has on the grizzly bear population.

**C.      History of Incidental Take Statements for the Upper Green River Area**

92.      In a 1999 biological opinion, FWS anticipated the lethal removal of five grizzly bears (four males and one female) over an indefinite time period as a result of livestock grazing authorized by USFS on the area's allotments.

93.    By 2009, USFS had reached the level of anticipated take in the 1999 biological

opinion. FWS produced another biological opinion in January of 2011 that anticipated the take of

six grizzly bears within any consecutive three-year period. USFS reached this level of take by

August of 2012, and exceeded it later that month.

94.    FWS opted to provide USFS a short-term ITS that allowed another three bears to

be lethally removed during the 2012 grazing season.

95.    In 2013, FWS produced another biological opinion which increased the

anticipated lethal take to 11 grizzly bears within any consecutive three-year period as a result of

USFS-authorized livestock grazing in the Upper Green River area. FWS directed USFS to limit

the proportion of lethally removed bears to three females and eight males. However, four grizzly

bears (two males and two females) were lethally removed during the 2013 grazing season alone.

USFS believed it would exceed the anticipated lethal take of female grizzly bears during the first

three-year consecutive period.

96.    In 2014, FWS produced yet another biological opinion in which it anticipated and

exempted the lethal removal of eleven grizzly bears within any consecutive three-year period.

FWS no longer established separate take allocations by sex, but did require USFS to contact

FWS "[i]f 5 or more grizzly bears are lethally removed, including 3 or more females . . . to

discuss the adequacy of existing mechanisms to minimize additional take." Biological Opinion

for the 2014 Supplement to the 2013 Supplement and 2010 Amendment to the 1999 Biological

Assessment for Livestock Grazing on the Northern Portions of the Pinedale Ranger District,

06813000-2014-F-0040 (2014 Biological Opinion) at 43.

97.    The current 2019 Biological Opinion anticipates and exempts from ESA liability

the lethal take of up to 72 grizzly bears over ten years, with no differentiation between male and

female bears, despite the importance of female bears to the health and recovery of the overall GYE grizzly bear population.

      **D.**    **FWS's 2019 Biological Opinion Analysis and Conclusions**

    98.    For purposes of its 2019 Biological Opinion for the UGRA Project's effects on grizzly bears, FWS delineates the action area as "a distance of 7.5 mile[s] beyond the perimeter of the collective allotment boundaries based on the maximum distance many of the bears traveled to carcasses in Craighead and Mitchell's (1982) study." 2019 Biological Opinion at 8-9.

    99.    FWS states that grizzly bear depredation on livestock "will continue as long as livestock are on the landscape, resulting in future livestock-grizzly bear conflicts, with some bears becoming chronic depredators." *Id*. at 42.

    100.    FWS notes '[t]here have been 37 management removals over the last 9 years within the action area," and 35 within the UGRA Project allotments. 2019 Biological Opinion at 29 and 42. FWS also notes that "the total incidental take that has occurred through management removals in the action area since 1999 is 37 (35 in the Upper Green Allotments) grizzly bears." *Id* at 28.

    101.    Although FWS has exempted incidental take of grizzly bears in other areas of the GYE through operative biological opinions and incidental take statements, FWS states outright that the only exempted incidental take it has considered in the 2019 Biological Opinion are those within or overlapping the action area (a 7.5-mile perimeter around the six UGRA Project allotments), not the broader Demographic Monitoring Area. 2019 Biological Opinion at 38.

    102.    FWS recognizes that in the UGRA Project area, "the number of livestock-bear conflicts and removals has steadily increased since 2010," at an average rate of 9 percent

annually since 2010 and 8 percent annually between 2014 and 2018. 2019 Biological Opinion at 29 and 43.

103.    In its 2019 Biological Opinion, FWS uses the 8 percent average rate of increase in grizzly bear removals "to adjust the number of removals upward through time," leading to its authorization of "the lethal removal of a maximum of 72 grizzly bears due to the killing of livestock, over the next 10 years of the grazing permit." 2019 Biological Opinion at 43. This is more than double the total number of lethal grizzly bear removals in the UGRA Project allotments since 2010 and comprises over ten percent of the current grizzly population across the entire GYE Demographic Monitoring Area.

104.    Although FWS limits its consideration of other anticipated GYE grizzly bear take in the 2019 Biological Opinion, it justifies its authorization of the lethal removal of 72 grizzly bears on "maintaining annual mortality limits" across the entire Demographic Monitoring Area and "maintain[ing] the population within the DMA around the 2002 through 2014 model-averaged Chao2 population estimate." *See* 2019 Biological Opinion at 46.

105.    Under past operative biological opinions for the Upper Green River area, FWS exempted from liability a much lower number of anticipated lethal take than under the 2019 Biological Opinion. Yet in 2017, with 12 known and probable independent female grizzly bear mortalities in the GYE, mortality for this cohort in the Demographic Monitoring Area reached 8.4 percent, just shy of the current 9 percent mortality threshold for independent females. *See* 2019 Biological Opinion at 21-22.

106.    In determining that lethal take of 72 grizzly bears over the next ten years will not surpass annual mortality limits, FWS ignores how close to exceeding annual limits grizzly bear mortality has come in the recent past under more restrictive incidental take statements.

107.    And, despite admitting population growth might be as low as zero percent annually, FWS offers no analysis of the combined effects of anticipated take across the Demographic Monitoring Area with the acknowledged possibility of zero population growth.

108.    Despite earlier stating that "[t]he long-term survival of the Yellowstone grizzly bear population over the next 100 to 200 years is contingent upon minimizing average annual mortality within the total population and especially that of adult females (Knight and Eberhardt, 1984, 1985)," FWS places no numerical or temporal limits on the number of females that can be lethally removed among the ITS's exempted killing of 72 grizzly bears over the next ten years. *See* 2019 Biological Opinion at 21.

109.    FWS acknowledges that "female bears have established territories within the action area." 2019 Biological Opinion at 29.

110.    FWS identifies the low survival rate of adult female grizzly bears "as the single most important factor in causing the decline of the Yellowstone population prior to the mid-1980's (Knight and Eberhardt 1985)." 2019 Biological Opinion at 17.

111.    Nowhere in the 2019 Biological Opinion or accompanying ITS does FWS evaluate the effect any proportion of lethally removed female grizzly bears among the anticipated total 72 bears could have on the GYE population.

112.    The complete failure to analyze or limit the take of female grizzly bears is unlike past incidental take statements for the UGRA Project area. *See* 2019 Biological Opinion at 38; *see also* 2014 Biological Opinion at 43.

### E.     FWS Reliance on USFS-Proposed Conservation Measures

113.    FWS considered the following conservation measures proposed by USFS in

reaching its Biological Opinion conclusion:

1) Bear Sanitation Guidelines will be followed for all camps associated with livestock operations as described and defined in Food Storage Order 04-03-330. Where outdoor toilets are available in Range Camps, keep doors closed and make toilets as "bear proof" as possible.

2) Riders are required to watch all livestock closely for sick, injured, or stray animals.

3) Forest Service employees designated by the Pinedale District Ranger will monitor allotments on a regular basis.

4) On Cattle Allotments: a) all carcasses **located within 0.5 mile** of Green River Lakes Road, Union Pass Road, FS 605, 660, 663B and 663C, GRL and Whiskey Campgrounds, private cabins, Kendall and Fish Creek guard station, permitted cow camps, permitted outfitter camps, Waterdog Lakes, and North Beaver and Tosi trailheads will be removed if possible or moved so that the carcass is at least **0.5 mile away** from the above described facilities, trailheads or roads; b) all carcasses in locations not described in 1 above that pose a health or safety hazard to the public or to the environment will be removed if possible or moved so that the carcass is at least **0.25 mile from** live streams, springs, lakes, riparian areas, system roads and trails, developed recreation areas, dispersed camping sites, and picnic sites; and c) all sick or injured animals will be removed or treated. In the event that rider safety is deemed an issue, an exception may be allowed as described in CM #5 below.

5) Exceptions to the requirements for removing or moving carcasses described in **CM #4** may be granted by the Pinedale District Ranger and/or his/her designated representative if human rider or herder safety is of concern. Rider or herder safety concerns include the possible presence of a grizzly bear in the immediate vicinity of carcasses, and carcasses being located in hazardous terrain such that attempting to move or remove may not be possible or unsafe. In such cases, a USFS employee or the WGFD bear specialist will be notified immediately of the hazard location and need for exception.

6) The Forest will recommend that all permittees and their representatives (herders, riders, or other employees) carry bear spray while working within allotments. Additional recommendations are that spray canisters be holstered or otherwise carried so that they are available for use in the event of encounters with bears; storing spray canisters in back packs, saddle bags, and vehicles are acceptable methods of storage during non-working time periods. Only brands of Bear Spray certified by the Interagency Grizzly Bear Committee are recommended.

7) Continue to identify and implement opportunities that reduce the potential for grizzly bear conflicts. The Forest has investigated and explored additional means of reducing grizzly bear-livestock conflicts, which included assessments of: a) cattle herding; and b) where appropriate, and when permittees are willing participants, study sites may be developed within allotments to "test" new management actions.

8) Through the permitting process and at annual meetings, the USFS will make grazing permittees aware of their responsibilities under the Endangered Species Act (ESA) in regards to laws and regulations concerning the taking of grizzly bears (Interagency Grizzly Bear Guidelines).

9) Continue to work in cooperation with the Service, the Wyoming Game and Fish Department, and the Interagency Grizzly Bear Study Team to identify and collect information related to the habitat use, survival, reproduction, and depredation tendencies of grizzly bears inhabiting Livestock Grazing Allotments on Northern Portions of the Pinedale Ranger District.

2019 Biological Opinion at 7-8 (emphasis in original).

114.    FWS relies on these conservation measures to support its conclusion that the UGRA Project—and the anticipated killing of up to 72 grizzly bears in association with the UGRA Project—would not jeopardize the continued existence of the grizzly bear in the GYE. 2019 Biological Opinion at 46.

115.    FWS states that under Conservation Measures 2, 4, and 5, "all livestock carcasses will be removed as soon as possible." 2019 Biological Opinion at 40. But just one paragraph later in its 2019 Biological Opinion, FWS says "[w]e recognize that complete carcass removal from the allotments is not possible due to the large and remote areas grazed by livestock on the Allotments and the difficulty in locating all carcasses over such vast areas, or locating them in a timely manner." *Id.*

116.    Conservation Measure 4 only directs the removal of carcasses "if possible," and Conservation Measure 5 is riddled with such broad discretionary exceptions that the alternative carcass movement requirements outlined in Measure 4 are uncertain, and even unlikely, to

occur. Based on vague assertions of the "possible presence of a grizzly bear" or "hazardous terrain," a mere telephone call to a USFS employee or the Wyoming Game and Fish Department bear specialist could lead to an exception being granted to carcass removal or movement requirements. *See* 2019 Biological Opinion at 7.

117.    Despite its acknowledgement that "livestock carrion associated livestock management[] could have detrimental effects to the grizzly bear," FWS offers no analysis or evaluation of whether USFS's proposed conservation measures regarding carcass movement will effectively address the threats to grizzly bears. *See* 2019 Biological Opinion at 39. Scientific research shows grizzly bears tend to avoid roads with significant motor vehicle traffic. *See* Northup *et al.* (2012).[5] Moving carcasses away from roads or other infrastructure merely moves a food source closer to where grizzlies are likely to be present, further conditioning them to associate livestock with food, and exacerbating grizzly bear-livestock conflicts.

118.    The other identified conservation measures similarly lack specificity, certainty, and assurances of implementation. Conservation Measure 2 directs riders "to watch all livestock closely," but provides no standards by which such direction will be gauged or mechanisms to ensure its enforcement or implementation. *See* 2019 Biological Opinion at 7. Conservation Measure 3 states that USFS "will monitor allotments on a regular basis," but again provides no details of what is considered "regular," what such monitoring will entail, and what the expected outcome of such monitoring will be in terms of addressing the threats to grizzly bears from the UGRA Project. *Id.*

---

[5] J.M. Northup *et al.*, *Vehicle traffic shapes grizzly bear behaviour on a multiple-use landscape*, Journal of Applied Ecology 49:1159-1167 (2012).

119.     Conservation Measure 6 states that USFS "will recommend all permittees and their representatives [] carry bear spray while working in the allotments," but does not issue mandatory direction. 2019 Biological Opinion at 8.

120.     Measures 7 through 9 do not require any substantive action whatsoever, only aspirations of cooperation and direction to attend meetings and continue attempting to "reduce the potential for grizzly bear conflicts." 2019 Biological Opinion at 8.

121.     None of these measures identify mechanisms by which implementation can be assured, and some by their very language are mere voluntary recommendations. Nevertheless, FWS assumes "[t]he risk of cattle/bear conflicts is minimized by implementation of conservation measures that are part of the grazing permit as a term and condition of the permits." 2019 Biological Opinion at 41.

122.     In fact, FWS acknowledges it does not know the actual effectiveness of the conservation measures offered by USFS; as part of the reporting requirements under the ITS, FWS directs USFS to review its management efforts to "improve understanding of the effectiveness of the Conservation Measures." 2019 Biological Opinion at 51.

123.     The same measures have been in place for years, according to previous biological opinions for the UGRA Project area. *See* 2014 Biological Opinion at 7-10. Yet over the same period of time, FWS admits "the number of livestock-bear conflicts and removals has steadily increased since 2010." 2019 Biological Opinion at 43. In the 2019 Biological Opinion, FWS offers no assessment of how similar conservation measures set forth in previous biological opinions have minimized—or not—the number of conflicts between grizzly bears and livestock.

F.    **Kendall Warm Springs Dace**

124.    The Kendall Warm Springs dace (*Rhinichthys osculus thermalis*) is a small fish found in the Kendall Warm Springs on the Bridger-Teton National Forest and nowhere else in the world. UGRA FEIS at 275.

125.    Due to its incredibly limited range and threats to its continued existence, including livestock impacts, the Kendall Warm Springs dace has been considered "endangered" since 1970. 35 Fed. Reg. 16047 (Oct. 13, 1970). FWS grandfathered the species' "endangered" classification into comparable protection and listing following enactment of the ESA in 1973. 39 Fed. Reg. 1171 (Jan. 4, 1974).

126.    The Kendall Warm Springs consist of a 328-yard-long tributary to the Green River warmed to a constant temperature of 85 degrees Fahrenheit by numerous thermal seeps. UGRA FEIS at 275.

127.    Within the springs, "[a]dult dace primarily use shallow habitat in the main channel, while juvenile dace are mostly found in slower channel margin habitat." UGRA FEIS at 275.

128.    According to FWS, dace shelter in the Springs' underwater plants: "[a]quatic vegetation provides important hiding cover for the dace." UGRA FEIS at 275.

129.    USFS maintains a fenced exclosure around the springs to protect the dace from livestock impacts. However, the UGRA Project allows cattle within the exclosure when herded by permittees to and from the Project area's grazing allotments. UGRA FEIS 289.

130.    USFS concedes that livestock can erode stream banks and cause bank instability which will change discharge, sediment load and channel stability. UGRA FEIS at 283. "Such degraded riparian and channel conditions can affect fish by increasing summer stream

temperature, reducing winter temperatures resulting in anchor ice, reducing cover through lack of undercut banks or overhead vegetation, and decreasing terrestrial and aquatic fish food items (Platts 1991)." *Id.*

131.    USFS admits herding cattle through the exclosure "could cause dace to temporarily switch habitat, elevate turbidity, and alter submergent vegetation cover." UGRA FEIS at 289.

## FIRST CAUSE OF ACTION
## Violation of Endangered Species Act § 7

### Failure to Evaluate and Consider Anticipated Take Across the GYE

132.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

133.    The ESA permits FWS to anticipate and exempt incidental take of a threatened species from otherwise applicable civil and criminal liability in connection with a federal agency action only after determining that such take is not likely to jeopardize the continued existence of the affected species. *See* 16 U.S.C. § 1536(b)(4)(B); *see also* 50 C.F.R. § 402.14(i).

134.    FWS's 2019 Biological Opinion for the UGRA Project anticipates and exempts the incidental take of up to 72 grizzly bears in the project area over ten years. FWS found that this level of incidental take would not jeopardize the continued existence of the grizzly bear population.

135.    FWS reaches this "no jeopardy" conclusion by looking at the overall population trajectory of and mortality thresholds established for viability of the Greater Yellowstone Ecosystem grizzly bear population, and determined that the take of 72 bears in the UGRA Project area "will not appreciably reduce the overall population, reproduction, and distribution of grizzly bears in the GYE recovery area." 2019 Biological Opinion at 46. FWS thus purported to

rely on an ecosystem-wide analysis to determine "this Project will not cause jeopardy of the grizzly bear in the GYE recovery area." *Id.*

136.    Having chosen to rely on an ecosystem-wide analysis to support its "no jeopardy" determination, FWS could not rationally ignore all of the additional take of grizzly bears the agency has anticipated and exempted throughout the GYE Demographic Monitoring Area, all of which counts toward annual mortality limits and recovery criteria.

137.    Nevertheless, FWS fails to consider GYE-wide anticipated take, or the implications of this level of take for total grizzly bear mortality in the GYE, before relying on "maintaining annual mortality limits" within the Demographic Monitoring Area to conclude that its anticipated and exempted take of 72 grizzly bears would be inconsequential for the larger GYE population. *See* 2019 Biological Opinion at 46.

138.    Only through comprehensive consideration of all anticipated take of grizzly bears throughout the GYE could FWS rationally determine whether the anticipated further take of 72 more bears as a result of the UGRA Project would have a relatively minor impact, as FWS concluded, or instead threaten the continued existence of the species.

139.    FWS's failure to consider all the incidental take of grizzly bears the agency has anticipated and exempted throughout the GYE violated the ESA because FWS failed to "utilize the best scientific and commercial data available" in its jeopardy analysis, 16 U.S.C. § 1536(a)(2), as well as ignored important aspects of the problem at hand.

**Failure to Consider Implications of Disproportionate Lethal Take of Female Grizzly Bears**

140.    FWS's failure to examine anticipated take of grizzly bears across the GYE is particularly significant because under the Incidental Take Statement at issue here, all or a majority of the 72 grizzly bears killed could potentially be female. Unlike past incidental take

statements for the Upper Green River area, the 2019 ITS placed no numerical or temporal constraints on the number of female grizzly bear takes it exempted, despite FWS repeatedly acknowledging the importance of female grizzly bears to the health and survival of the GYE grizzly bear population.

141.    FWS offers no analysis of how the lethal take of a disproportionate number of female grizzlies could potentially exceed annual mortality limits for independent-aged female grizzly bears established for the GYE, considering the population growth rate is currently as low as zero percent annually in the Demographic Monitoring Area.

142.    FWS does not explain why, unlike past incidental take statements for the Upper Green River area, it did not place temporal or numerical limits on the lethal take of female grizzly bears exempted under the ITS accompanying the 2019 Biological Opinion.

143.    FWS's failures violate the agency's statutory mandate to base its conclusions on the "best scientific and commercial data available," ignore perhaps the most important aspect of the problem according to its own past conclusions, and yielded an arbitrary and unlawful determination that USFS's authorization of the UGRA Project is "not likely to jeopardize the continued existence" of the grizzly bear.

### Failure to Consider Effects of Shifts in Food Sources on Grizzlies in the UGRA Project Area and the Creation of a Fracture Zone

144.    FWS must prepare a biological opinion for an agency action that is likely to adversely affect species listed under the ESA. ESA regulations require a biological opinion to include "[a] detailed discussion of the effects of the action." 50 C.F.R. § 402.14(h)(2).

145.    Biological opinions must apply the best available science and cannot ignore available information or relevant factors.

146.    The 2019 Biological Opinion regarding the UGRA Project's effects on grizzly bears does not address all relevant factors in relation to the Project.

147.    FWS concedes in the 2019 Biological Opinion that grizzly bears in the Upper Green River area are eating more meat to compensate for the loss of whitebark pines, but FWS fails to analyze and disclose the impacts of whitebark pine loss to grizzly bears in relation to the increase in depredation on cattle. Additionally, the 2019 Biological Opinion fails to consider that army cutworm moths are not available in the Upper Green River as an alternative high-quality food source that could offset losses of whitebark pines.

148.    The Interagency Grizzly Bear Study Team's data establish a strong correlation between increases in grizzly bear depredation on cattle and temporal and spatial patterns of whitebark pine loss. FWS's 2019 Biological Opinion fails to disclose and address the effects of the extensive, rapid, and near complete loss of whitebark pines in the Upper Green River area on grizzly bears.

149.    Further, in the 2019 Biological Opinion, FWS fails to consider the agency's own data that shows livestock depredation by grizzly bears in the Upper Green River area has increased since 2010 as a result of bears eating more meat in compensation for devastating losses of whitebark pines in the surrounding area, exacerbated by a lack of army cutworm sites that would otherwise offer an alternative high-quality food.

150.    FWS further fails to consider the effect of the UGRA Project creating an "ecological trap" between suitable habitat to the south and southeast and core grizzly bear distribution in the GYE to the north and northwest of the UGRA Project allotments.

151.    These failures result in an arbitrary and capricious 2019 Biological Opinion that is not in accordance with the ESA, in violation of the APA.

152.     FWS's violations of law have injured and continue to injure Plaintiffs' aesthetic, conservation, recreational, scientific, educational, professional, and wildlife preservation interests.

153.     Plaintiffs have been required to expend costs and to obtain the services of attorneys to prosecute this action.

## SECOND CAUSE OF ACTION
## Violation of Endangered Species Act § 7

### Unlawful Reliance on Uncertain and Ineffective Conservation Measures

154.     Plaintiffs reallege and incorporate by reference all preceding paragraphs.

155.     FWS premised its conclusion that the UGRA Project is not likely to jeopardize grizzly bears on USFS's commitment to implement and enforce identified conservation measures. 2019 Biological Opinion at 46. Yet the conservation measures contain few substantive, mandatory obligations that will effectively protect or address the actual threats to grizzly bears, nor do the measures provide assurances of implementation. FWS assumed the measures would be effective without question, even though most measures are either voluntary, discretionary, or contain broad exceptions so as to render them uncertain to occur. One measure, directing the disposal of livestock carcasses in the backcountry, will likely even exacerbate grizzly-livestock conflicts.

156.     A "no jeopardy" opinion may not be based on conservation measures that are not "reasonably specific, certain to occur, and capable of implementation." *Ctr. for Biological Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139, 1152 (D. Ariz. 2002) (citing *Sierra Club v. Marsh*, 816 F.2d 1376, 9th Cir. 1987)). To support a "no jeopardy" opinion, conservation measures "must be subject to deadlines or otherwise-enforceable obligations." *Id.* Conservation measures

"must address the threats to the species in a way that satisfies the jeopardy and adverse modification standards." *Id.* Measures that are not effective in protecting listed species cannot support a "no jeopardy" opinion. *Id.*

157.    As described above in ¶¶ 113-123, these conservation measures do not address the threats to grizzly bears, but may even amplify those threats by shifting dead livestock carcasses away from roads and closer to areas grizzlies are more likely to be present. This will not decrease grizzly bears' use of such carcasses as a food source, and will instead perpetuate and increase the bears' association of livestock as a reliable food source. In turn, more grizzly bear-livestock conflicts will occur.

158.    Further, Conservation Measures 4 and 5, in particular, offer no clear mechanisms by which carcass removal and movement requirements will be enforced or assessed. Instead, because of the allotments' remote and rugged terrain and the presence of grizzly bears with established territories in the Project area, the measures' discretionary exceptions are broad enough that nearly all instances in which a dead cow is actually located on the allotments could be granted reprieve from removal or movement requirements.

159.    Because the conservation measures relied upon by FWS to support its 2019 Biological Opinion are not reasonably specific, certain to occur, or capable of implementation, and because they do not address the threats the UGRA Project poses to the grizzly bear (and in some cases, make them worse), FWS's reliance on the measures to reach a conclusion that the UGRA Project will not jeopardize the continued existence of the grizzly bear in the Greater Yellowstone Ecosystem is arbitrary and capricious, violates section 7 of the Endangered Species Act, and must be set aside.

160.    FWS's violations of law have injured and continue to injure Plaintiffs' aesthetic, conservation, recreational, scientific, educational, professional, and wildlife preservation interests.

161.    Plaintiffs have been required to expend costs and to obtain the services of attorneys to prosecute this action.

### THIRD CAUSE OF ACTION
### Violation of Endangered Species Act § 7

### Unlawful Reliance on Legally Flawed Biological Opinion and Incidental Take Statement

162.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

163.    Because the "no jeopardy" determination in FWS's 2019 Biological Opinion and the accompanying Incidental Take Statement exempting the killing of 72 grizzly bears from ESA liability were arbitrary and unlawful for the reasons stated above, USFS may not lawfully rely on those documents to discharge its own ESA responsibilities in connection with grizzly bear take in the UGRA Project area and broader Greater Yellowstone Ecosystem.

164.    "Consulting with the FWS alone does not satisfy an agency's duty under the Endangered Species Act." *Resources Ltd., Inc. v. Robertson*, 35 F.3d 1300, 1304 (9th Cir. 1993). To the contrary, the ESA independently requires each agency to "insure that any action [it] authorize[s], fund[s], or carrie[s] out . . . is not likely to jeopardize the continued existence of any endangered species or threatened species." 16 U.S.C. § 1536(a)(2). Because "[a]n agency cannot 'abrogate its responsibility to ensure that its actions will not jeopardize a listed species[,] its decision to rely on a FWS biological opinion must not have been arbitrary or capricious.'" *Resources Ltd.*, 35 F.3d at 1304 (quotations and citations omitted).

165.    Here, FWS's 2019 Biological Opinion and ITS for the UGRA Project are
arbitrary, capricious, and unlawful, and USFS may not rationally or lawfully rely on them. USFS
violated the ESA by relying on FWS's unlawful 2019 Biological Opinion and ITS to satisfy
USFS's duties under the ESA in connection with the anticipated killing of 72 grizzly bears
resulting from USFS's authorization of the UGRA Project.

166.    USFS's violations of law have injured and continue to injure Plaintiffs' aesthetic,
conservation, recreational, scientific, educational, professional, and wildlife preservation
interests.

167.    Plaintiffs have been required to expend costs and to obtain the services of
attorneys to prosecute this action.

## FOURTH CAUSE OF ACTION
### Violation of the Endangered Species Act §§ 7 and 9

### Unlawful Take of Endangered Kendall Warm Springs Dace
### and Failure to Undertake Formal Consultation

168.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

169.    USFS's UGRA Project Record of Decision authorizes grazing permittees to trail
or herd cattle to and from grazing allotments in the Project area through the Kendall Warm
Springs dace exclosure, constructed specifically to exclude livestock in order to protect dace
habitat.

170.    USFS admits that such herding or trailing of cattle through the exclosure "could
cause dace to temporarily switch habitat, elevate turbidity, and alter submergent vegetation
cover." UGRA FEIS at 289.

171.    Because the Kendall Warm Springs dace has such limited habitat, and because
aquatic vegetation provides important sheltering habitat to the dace, such impacts to the springs

will cause habitat degradation and significant impairment of essential behavioral patterns. This constitutes "harm" to the species, and "take" under the Endangered Species Act.

172.    In violation of the ESA, USFS and FWS have not engaged in formal consultation under section 7 of the Endangered Species Act resulting in a biological opinion or incidental take statement that would exempt USFS from ESA liability for such take.

173.    Because such take is unauthorized and unlawful, USFS is in violation of the "take" provision of the Endangered Species Act, 16 U.S.C. § 1538(a)(1)(B).

174.    USFS's and FWS's violations of law have injured and continue to injure Plaintiffs' aesthetic, conservation, recreational, scientific, educational, professional, and wildlife preservation interests.

175.    Plaintiffs have been required to expend costs and to obtain the services of attorneys to prosecute this action.

### REQUEST FOR RELIEF

THEREFORE, Plaintiffs respectfully request that this Court:

1.  Declare that FWS and USFS violated the ESA in connection with FWS's issuance of the 2019 Biological Opinion and Incidental Take Statement for the UGRA Project, and USFS's reliance on those documents to satisfy its own ESA duties;

2.  Set aside FWS's 2019 Biological Opinion for the UGRA Project and remand the issue of grizzly bear take in connection with the UGRA Project to FWS and USFS for further action consistent with the requirements of the ESA;

3.  Declare that USFS and FWS violated the ESA by failing to initiate formal consultation on the effects of the Project on the Kendall Warm Springs dace;

4.  Declare USFS's authorization of herding and trailing cattle through the Kendall Warm Springs exclosure to be unlawful take under the ESA;

5.  Set aside USFS's authorization of herding and trailing cattle through the Kendall Warm Springs exclosure and remand the issue of the UGRA Project's effects on the Kendall Warm Springs dace to USFS and FWS for further action consistent with the requirements of the ESA;

6.  Retain jurisdiction of this action to ensure compliance with the Court's decree;

7.  Award Plaintiffs their reasonable fees, costs, and expenses associated with this litigation, including attorneys' fees as authorized by the Equal Access to Justice Act, 28 U.S.C. § 2412(d), the Endangered Species Act, 16 U.S.C. § 1540(g)(4), and other applicable provisions; and

8.  Grant Plaintiffs such further and additional relief as the Court may deem just and proper.

Respectfully submitted this 31st day of March, 2020,

/s/ David A. Bahr
David A. Bahr (D.D.C. Bar # OR0001)
1035 ½ Monroe St
Eugene, OR 97402
(541) 566-6439
davebahr@mindspring.com

/s/ John Persell
John Persell (*PHV* pending)
309 N Holland St
Portland, OR 97217
(503) 896-6472
jpersell@westernwatersheds.org

/s/ Kristine Akland
Kristine Akland (*PHV* pending)
317 E Spruce St, P.O. Box 7274
Missoula, MT 59807
(406) 544-9863
aklandlawfirm@gmail.com